IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| J. PATRICK SCULLY | ) | |
| | ) | Civil Action No. 03-1852 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE JOY FLOWERS CONTI |
| | ) | |
| ALLEGHENY LUDLUM CORPORATION, | ) | Magistrate Judge Caiazza |
| ALLEGHENY TECHNOLOGIES | ) | |
| INCORPORATED, JOHN SCARFUTTI, | ) | |
| AND DAVID MURPHY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

J. Patrick Scully ("Scully")alleges age discrimination and interference with his pension benefits in violation of federal and state law. His former employer, Allegheny Ludlum Corp. ("ALC")[1], a specialty steel manufacturer in Western Pennsylvania, eliminated his position as Manager of Labor Relations during what it describes as a 2002 company-wide reduction in force. Scully contends that he was targeted for termination because of his age, in violation of § 4 of the Age Discrimination in Employment Act("ADEA"), 29 U.S.C. § 623, and in order to interfere with his receipt of full pension benefits, in violation of § 510 of the

---

[1]Allegheny Technologies, Inc., ALC's parent company, was dismissed as a defendant with the filing of the Second Amended Complaint. Defendants Scarfutti and Murphy were added as Defendants at the same time.

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §
1140. Scully also alleges that ALC employees, John Scarfutti
("Scarfutti"), and David Murphy ("Murphy"), aided and abetted the
alleged discrimination in violation of the Pennsylvania Human
Relations Act("PHRA"), 43 Pa. Con. Stat. Ann. §§ 951-963 (1991).
The Defendants' Motions for Summary Judgment (Docs. 41 and 43)
are pending. It is respectfully recommended that these Motions be
granted.[2]

## I. <u>DISCUSSION</u>

### A. <u>Background</u>

Scully worked at ALC from 1974 until the summer of 2002 when
his job was eliminated as part of a reorganization precipitated
by earnings losses in 2001 and 2002. About 220 ALC workers were
released in late 2001 when ALC closed its smelting facility in
Washington County, Pennsylvania. In December 2002, 300 workers
were laid off company-wide, followed by 275 more in the summer of
2002.[3]

---

[2]The corporate and individual defendants have also filed a Motion
to Strike (Doc. 62), seeking to have items of evidence excluded from
the record. This motion should be denied as moot. The disputed
material was not considered in ruling on this motion, but would not
have changed the court's analysis.

[3]In arriving at these figures, the court has taken judicial
notice of a newspaper article titled, "Allegheny Technologies Details
Losses for Investors."  This article appeared in the Pittsburgh
Tribune-Review on May 8, 2003. "Fed. R. Evid. 201(b) provides that '[a
judicially noticed fact] must be one not subject to reasonable dispute
in that it is either (1) generally known within the territorial
jurisdiction of the trial court or (2) capable of accurate and ready
determination by sources whose accuracy cannot reasonably be

On August 16, 2002, Scarfutti, Vice President for Human Resources, and Murphy, Director of Employee Relations, met with Scully to tell him that his position had been eliminated and that some of his duties would be assumed by 37 year old Gerald Moser, another ALC employee holding the same position and job title as Scully. The remainder of Scully's duties would be carried out by Gary Phillips ("Phillips"), the Director of Labor Relations and Scully's direct supervisor. Scully, who at the time was fifty-three years old, was offered the opportunity to sign a release insulating ALC from liability for any aspect of the job termination. In return for executing the release, Scully would have received severance benefits and fully vested pension benefits. Scully did not sign the release. Within a week, ALC notified Scully that it had erred; the fully vested pension benefits information described in the release had been included by mistake. Based on Scully's length of service, he would instead receive lower benefits under what was known as the 70/80 plan whether or not he signed the release. The difference in benefits payable under the fully vested plan and the 70/80 plan was significant. Scully's benefits would have vested fully and automatically had he worked at ALC approximately two years longer.

---

questioned.'" Ritter v. Hughes Aircraft Co., 58 F.3d 454, 458 (9th Cir. 1995).

Scully alleges that he suffered age discrimination when the termination selection process used by ALC was manipulated in order to identify him, rather than Moser, as the employee whose position would be eliminated. He claims, too, that his discharge was motivated in part by ALC's plan to "prevent[ ]" him from obtaining a thirty or more year retirement benefit under the plan." (Sec. Amend. Compl. ¶ 82).[4]

### B. <u>Standard of Review</u>

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A "material fact" is one that "might affect the outcome of the suit." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248,(1986).

While the moving party has the initial burden of identifying evidence demonstrating the absence of a genuine issue of material fact, the nonmoving party must make a showing sufficient to establish the existence of every element necessary to its case and on which it bears the burden of proof. See <u>Celotex Corp. v.</u>

---

[4]Scully also alleges that Scarfutti and Murphy violated the PHRC by aiding and abetting ALC's discrimination. The same legal standard applies to ADEA and PHRC claims. <u>Glanzman v. Metro. Mgmt. Corp.</u>, 391 F.3d 506, 509 n.2 (3d Cir. 2004).

Catrett, 477 U.S. 317(1986). Credibility determinations are not
the function of the judge; rather, "[t]he evidence of the
non-movant is to be believed, and all justifiable inferences are
to be drawn in his favor." Anderson, 477 U.S. at 255. With this
standard in mind, the court turns to Scully's claims.

### C. <u>The ADEA Claim</u>

When an age discrimination claim arises in the context of a
reduction in force, the plaintiff is required to show: (1) that
he was over the age of forty at the time of the layoff; (2) that
he was laid off from a job for which he was qualified; and (3)
that a similarly situated younger person with less seniority was
retained. <u>Massarsky v. General Motors Corp.</u>, 706 F.2d 111, 118
(3d Cir. 1983). If the plaintiff establishes a prima facie case,
the burden of production shifts to the defendant, who must offer
evidence of a legitimate business reason for the discharge.
<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). "If that
showing is made, the burden, which is now more significant,
shifts back to the employee." <u>Billet v. Cigna Corp.</u>, 940 F.2d
812, 816 (3d Cir. 1991) *abrogated in part on other grounds by* <u>St.
Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993).

In order to avoid summary judgment, the plaintiff must now
show, by a preponderance of the evidence, that (1) the legitimate
reason articulated by his employer is not worthy of credence; or
(2) the employer's action was more likely to have been motivated

by discrimination. Sullivan v. Standard Chlorine of Del. Inc., 845 F. Supp. 167, 175 (D. Del. 1995). The plaintiff's "evidence must be sufficient to support a *reasonable* inference that the explanation given for the employment decision is a pretext for discrimination." Id. (emphasis in original). A pretext cannot be established unless the reason offered by the employer "was false, *and* . . . discrimination was the real reason." Id. (quoting Hicks, 509 U.S. at 512 n.4 (1993)(emphasis in original)). The burden of persuasion remains with the plaintiff at all times.

For purposes of the pending motions for summary judgment, the court assumes, as do the parties, that Scully has established a prima facie case of age discrimination.

### 1. **The Business Justification Articulated by ALC**

ALC contends that its decision to terminate Scully was motivated by economic necessity. In 2002, especially after the events of 9/11, ALC was in serious economic straits. This was due in part to the fact that its single largest customer was the commercial aircraft industry, and orders had fallen precipitously. (Kittenbrink Dep. 40). In response to this downturn, ALC management announced its goal of a twenty percent overall cut in the Western Pennsylvania Region's salaried staff. All departments were to contribute to this 260 person reduction. (Id., at 53-54). Each department head was directed to provide the Department of Human Resources with a tentative plan for

-6-

accomplishing the reduction, and a "best guess" as to the
position(s) to be eliminated. If a position held by only one
person could be eliminated, the position was abolished.  If the
proposed reduction targeted a position held by two or more
employees, the decision-making process was more involved.
(Scarfutti Dep. 68).

From 1993 through the time of Scully's termination, ALC,
when faced with the need to make layoffs, used a "peer analysis"
procedure to rank employees in the same position in order to
identify who would be terminated. (Murphy Dep. 52). ALC describes
peer analysis as a standard review conducted by the immediate
supervisor of the "peer group" to be affected by layoffs.  The
results of this review are given a second look by the Director of
Employee Relations in order to ensure that the review is
consistent with past annual performance evaluations and does not
indicate improper bias.

Prior to August 2002, Scarfutti consulted with Phillips,
and drafted a tentative plan.  The plan reflected Phillips'
initial recommendation that the Human Resources Department be
restructured by eliminating one of the two managers of labor
relations. His "best guess" was that Scully, rather than Moser,
would be terminated. Scarfutti agreed, based on his familiarity
with Scully and his work during the nearly ten years that
Scarfutti served as Scully's direct supervisor. (Scarfutti Aff. ¶

-7-

92-95). Both Scarfutti and Phillips concluded that Moser should be retained because historically his overall performance exceeded Scully's.[5] Their decision was allegedly tentative, pending completion of the peer analysis.

The actual peer analysis was initiated with Phillips' identification of the duties essential to the position held by Scully and Moser. Next, Phillips prepared comments on each man's performance in the identified areas. Scully's comments were almost uniformly negative, while Moser's, with one exception, were positive. The next step in the process was for Phillips to assign numerical performance scores for Scully and Phillips in each of the duty areas. Before he scored Scully or Moser, Phillips sent copies of the partially completed review forms to Scarfutti, requesting input. This request was made via email at 4:00 p.m. on August 14, 2002, two days before Scully was terminated. (Scarfutti Dep. 180).

In response, Scarfutti made notes on his copy of Scully's form indicating that there had been numerous complaints about the timeliness of Scully's response to union grievances, and

---

[5]For performance years 1991 - 2000 inclusive, Scarfutti conducted Scully's reviews, and arrived at an overall numerical performance ranking. (Def. Joint Stmt. of Undisputed Facts Paragraphs 49, 52, 53) Moser's scores for the years listed were 6, 5, 6, 7, 7, 7, 6, and 7 out of a possible nine. In 2000, the ranking scale was revised, and Moser was given a three out of a possible five. In years 1993, 1995, 1996, 1997, 1998, 1999, and 2000, Scully received ratings of 6, 6, 5, 6, 4, 5, and 6 on the 1-9 scale. In 2002, Scully, like Moser, was given a 3 out of a possible 5.

-8-

reminding Phillips that Scully had been placed on disciplinary probation in 2000.  After he considered Scarfutti's notations, Phillips expanded his own comments on timeliness, and added the following summary of Scully's performance deficiencies: "Previously placed on probation. Punctuality a problem. Continually arrives late for meetings. Timely completion of tasks an issue. Made comment to Paul Ferrara to the effect that he would put more effort into [his] job if it were earlier in his career." Phillips also added to Moser's form two positive comments suggested by Scarfutti.  Phillips also assigned ratings to Scully and Moser for each essential duty. The forms, this time with performance numbers, were sent to Scarfutti a second time. Scarfutti suggested that Phillips might want to add a description of two of the incidents underlying the decision to place Scully on probation, but Phillips did not do so. (Scarfutti Dep. Exh. 16-19).

After reviewing Scarfutti's final comments, Phillips submitted the peer analysis forms to the Director of Employee Relations, Murphy.  Murphy was charged with reviewing the forms in order to identify any bias in the selection process. He was also responsible for comparing the peer analysis performance ratings with the employees' performance as reflected in the prior two years' annual evaluations. ALC states that this was done in order to ensure that the employee's performance was evaluated

consistently. (Murphy Dep. ¶¶ 4-6).

Allegedly because Moser and Scully had very similar performance ratings during 2000 and 2001, Murphy examined the performance records of each over a nine year period, noting that Scully had received lower rankings during most of those years, and that virtually all of the appraisals identified areas where improvement was needed. Murphy found that Scully's past reviews were generally consistent with the lower performance ranking assigned to him by Phillips in the course of the peer review.

Because he did not detect any anomaly in the peer review rankings, Murphy applied a predetermined formula[6] to the forms in order to calculate composite numerical scores for Moser and Scully. Scully received the lower score, a 4.7, while Moser obtained a 6.4. On the basis of this lower score, the decision to terminate Scully became final. ALC contends that this performance-based termination was a sound business decision made in response to economic necessity.

The court is satisfied that ALC has articulated "a facially legitimate reason" for eliminating Scully's position, Lewis v. University of Pittsburgh, 725 F.2d 910, 914 (3d Cir. 1983). As a result, Scully must have adduced evidence sufficient to demonstrate that ALC's explanation "is in fact merely a pretext, i.e. a fiction which obscures the reality of [age]

---

[6]This formula assigned a value of 80% to the performance score, 10% to attendance, and 10% to years of service.

discrimination." <u>Id.</u>

## 2. <u>Scully's Allegations of Pretext</u>

Establishing pretext "places a difficult burden on
[Scully]." <u>Fuentes v. Perskie</u>, 32 F.3d 759,765 (3d Cir. 1994). In
order to avoid summary judgment, he must show such "weaknesses,
implausibilities, inconsistencies, incoherencies, or
contradictions in the [ALC's] proffered . . . reason[ ] for
[terminating him] that a reasonable factfinder *could* rationally
[find] it 'unworthy of credence.'" <u>Id.</u> (internal citation
omitted)(emphasis in original). "It is not enough that he show
that [his] employer's decision was wrong or mistaken, since the
factual dispute . . . is whether discriminatory animus motivated
[ALC], not whether the [its decision was] wise, shrewd, prudent,
or competent." <u>Id.</u>

Following a painstaking review of the record, the court
concludes, without hesitation, that Scully has failed to raise an
inference of age discrimination. In attempting to establish
pretext, Scully relies on a number of statements which the court
will consider seriatim:

> (a) <u>ALC's Human Resources Department was not
> specifically told to reduce its numbers by twenty
> percent. Management instead intended that this target
> apply to the company as a whole.</u>

The court does not understand how this observation relates
even remotely to age discrimination. Scully does not seem to

argue that ALC fabricated the need to downsize, or that the
Department of Human Resources was unfairly or disproportionately
burdened by the layoffs. Scully complains that only fifteen
percent of the positions in his department were eliminated, when
the figure should have been closer to twenty percent. This
argument's tail precedes its head. If a higher percentage of
personnel in the Human Resources Department <u>had</u> been targeted for
elimination, Scully's chances of losing his job could only have
increased. The fact that his department suffered <u>less</u> than others
does nothing to advance his discrimination claim.

> (b) <u>Scarfutti was the real decision maker in
> Scully's case</u>.

Scully does not explain how Scarfutti's involvement in the
decision making process increases the likelihood of age
discrimination. Clearly, the peer review process was not intended
to be an entirely objective mathematically precise formula
designed to operate without human input. Virtually all
performance appraisals contain a substantial subjective element,
and the decision to terminate one employee over another should
typically be made based on as much information as possible.
Scarfutti, of all of the managers at ALC, was arguably uniquely
qualified to evaluate Scully's performance and future prospects.
He served as Scully's direct supervisor for ten of Scully's last
eleven years at ALC, and was only one step removed from him in

the final year. It would have been surprising if his input had
not been solicited or credited.

It is difficult for the court to see why Scarfutti, who
was older than Scully, would have targeted Scully for termination
on the basis of his age. It is also difficult for the court to
see that the outcome of the peer analysis would have been
different had Scarfutti not participated in the process. In the
spring of 2002, Phillips, who is also older than Scully, headed
the Labor Relations Department. Seeing the economic forecast on
the wall, he undertook a proactive analysis of how the Department
could function effectively with less manpower. He concluded that
although he and Moser could function without Scully, he and
Scully could not manage without Moser. (Scarfutti Dep. 92-93).
Weeks before the peer analysis, Phillips, without consulting
Scarfutti, had formed an opinion as to the relative abilities of
Scully and Moser, and that opinion did not favor Scully.

Finally, the record simply does not show that Scarfutti was
motivated by age-based animus even if, arguendo, the court
accepts that he inappropriately wielded his power and position
to target Scully for a reason other than performance. Scully
himself seems to recognize this when he suggests that Scarfutti
retained Moser based on favoritism. Specifically, he argues that
Scarfutti favored Moser based on a long and close relationship
with Moser's father. Scarfutti worked with Moser's father for

-13-

many years, and regards him as a mentor. (Pl. Br. in Opp. to [ALC's] Motion for Sum. J. 14 n.9). If Scully is able to look at this record and argue that something other than age discrimination, such as Scarfutti's relationship with Moser's father, may have motivated his termination, the court cannot expect that a jury would reach a different conclusion.

> (c) <u>Scarfutti selected Scully for termination and calculated his pension benefits prior to the peer analysis</u>.

ALC does not dispute that Scarfutti and Phillips identified Scully as their "best guess" for termination in the spring of 2002. They knew that staff reductions would be required and, based on Phillips initial suggestions, engaged in advance planning which included compiling tentative employee lists and <u>may</u> have included the preparation of paperwork detailing severance and pension benefits.[7] Given that the peer review analysis was conducted only one or two days prior to Scully's termination and that there was, by that point, little question as to the outcome, the court does not doubt that paperwork <u>had</u> been completed.

Again, the court does not find that this argument contributes to an inference of pretext. Even if Scully is right that the peer analysis was largely pro forma, this does not mean

---

[7]The record does not establish who calculated Scully's pension benefits or when the calculation was done.

that the "real" termination decision was based on age. Scully's performance had been an issue for years prior to his termination, and, at every point in the process, from annual evaluations through the downsizing plan, and completion of the peer analysis, these performance problems had been repeatedly identified, reiterated, and documented.

The court grants that the peer review selection process was not perfect, and that it does not eliminate subjective opinions, short-sighted or foolhardy though they may be, from influencing decisions about which employees will be retained and which would be let go. The protection of the ADEA does not, however, extend to unfairness, unless the unfairness is caused by discrimination based on age. The court is, therefore, constrained to conclude that Scully has failed to show a credible connection between any aspect of the peer analysis and disparate treatment based on age.

> (d) <u>Others in management thought that Scully should be retained</u>;
>
> (e) <u>Scully should have received a higher performance score on the peer analysis because his excellent job skills were underrated; he had received a substantial raise, and had been praised many times by those with whom he worked.</u>

Neither of these allegations constitutes proof of pretext. The law makes clear that the use of "basically positive performance reviews. . . to show that more recent criticism was

pretextual fails as a matter of law." <u>Kautz v. Met-Pro Corp.</u>,
412 F.3d 463, 474 (3d Cir. 2005).

> (f) <u>Scarfutti gave inconsistent reasons for</u>
> <u>selecting Scully, basing it on performance at</u>
> <u>first, but then saying that he thought</u>
> <u>Moser was better able to handle the position.</u>

The court does not agree that these statements as
inconsistent. To the contrary, each expresses the same idea:
Scully, although obviously competent and able to perform in the
job, was less effective than Moser. If anything, these
"conflicting" statements tend to show that ALC was consistent in
explaining that its decision to terminate Scully was based on an
assessment of relative performance.

> (g) <u>Scarfutti told Moser that he had been</u>
> <u>retained because he was flexible, had the</u>
> <u>ability to learn and absorb new things quickly,</u>
> <u>was dependable, followed through on assignments,</u>
> <u>had good computer skills, and displayed personal</u>
> <u>initiative. According to Scully, this statement</u>
> <u>was comprised of age-based stereotypes.</u>

Scully has not identified and the court has not found any
authority for the proposition that the positive qualities
attributed to Moser are generally associated with youth. In the
court's view, the qualities listed would not cause the average
person to assume that they reflect an age-related bias. The court
does not find any basis for concluding that these attributes are
less likely to be seen in older workers as in younger ones.
Scarfutti's summary of Moser's strengths bolsters ALC's

contention that it retained Moser over Scully based on Moser's better relative performance.

> (h) Scarfutti directed Phillips to add comments to Scully's peer analysis form. The comments related to Scully's timeliness, task completion, initiative, and the fact that he had been placed on probation for misconduct in 2000. Scully states that two of the five events underlying the probation did not happen the way that management said.

Scarfutti was Scully's supervisor over a period of ten years, and was unquestionably familiar with his talents and his shortcomings. Although the record does not show that Scarfutti directed Phillips to include his comments on the peer analysis form, there can be no doubt that Phillips solicited, received, and incorporated Scarfutti's input. From a business standpoint, it is difficult to see why this input should not have been considered, especially since Scully does not dispute and, in fact, corroborates the substance of Scarfutti's comments. The two incidents of questionable behavior which Scarfutti mentioned during his second review of the peer analysis were not referenced on the form.

> (i) Peer analysis is not an objective process, but is based on highly subjective scores. At least one incident involving another employee in another area showed that the analysis could be disregarded in some circumstances.

What happened to another employer with another manager at another time is not evidence of what happened here, especially

-17-

where the other matter was not related to age discrimination.
Moreover, the law does not require that personnel decisions be
objective. "Barring any attempt to hide discrimination, [a
corporation] has the right to make business judgments on employee
status, particularly when the decision involves subjective
factors." Healy v. N.Y. Life Ins. Co., 860 F.2d 1209, 1220 (3d
Cir. 1988). The fact that subjective views played a role in the
termination process does not, by itself, create an inference of
discrimination. Sullivan, 845 F. Supp. at 179.

       (j) The peer performance scores assigned to Scully and
       Moser were inconsistent with prior annual performance
       appraisals. Scully's score was too low, and Moser's
       was too high.

     The fact that the peer performance ratings did not
correspond precisely to the scores that each man received in
prior annual appraisals does not undermine ALC's contention that
its termination decision was performance based. What was critical
in the evaluation of these employees was not an absolute score,
but their relative placement on a common scale. Moser was ranked
higher in the peer review, and was consistently ranked higher
than Scully over the time period that counted most. Scully
admitted as much in his deposition testimony:

    Q: So I want you to focus on 1998 through the termination of
    your employment in August of 2002, okay. During that time
    period, you and Gerald Moser both held the position of
    Manager of Labor Relations. Correct?

    A: Correct.

Q: Now during that time period, you would agree with me
would you not, that Gerald Moser's annual performance
numbers are better than yours throughout that time period?

A: Having seen them for the first time, he was rated higher than
I was.

(Scully Dep. 321).

(k) <u>Scully had more experience than Moser;</u>

An inference of age discrimination does not arise each time
an employer decides to retain a less experienced employee over
one who is more experienced. The law does not demand that
employers give preference to employees with more experience. To
read such a requirement into the ADEA would inject an element at
odds with the law's purpose, which is "to protect all workers,
young and old alike, from any employment decision based on age."
<u>Ace Elec. Contractors, Inc. v. Int'l Broth. Of Electrical</u>
<u>Workers, Local 191, AFL-CIO,</u> 414 F.3d 896, 901 (8th Cir. 2005).

In any event, it is not the employee's assessment of the
value of his experience that matters; the employer's perception
is controlling. <u>Smith v. Flax</u>, 618 F.2d 1062, 1067
(4th Cir. 1980).

(l) <u>A position of Manager of Labor Relations in</u>
<u>New England held by a younger employee was not</u>
<u>eliminated even though that region had fewer</u>
<u>plants, employees, and serious labor relations</u>
<u>problems than Western Pennsylvania.</u>

Scully has not attempted to show any connection between his
termination and ALC's decision to retain an employee in a

-19-

distinct ALC operation in another region of the country. "Surely
an employer with many different plants is not required to have
uniform employment policies among them." Browning v. Rohm & Haas
Tennessee, Inc., 16 F. Supp. 2d 896, 909 n.3. (E.D. Tenn. 1998).
The record does not refer to the state of ALC's business in New
England or anywhere other than Western Pennsylvania. Courts
evaluating a claim of discrimination should not make cross-
regional comparisons absent compelling evidence that an
employment decision in another region is directly related to the
decision before it.  If courts were to do otherwise, they would
risk becoming entangled in a company's global operations every
time an employee anywhere in the organization alleges
discrimination.

> (m) ALC terminated only employees in the
>     protected class

This allegation does not comport with the record.  In his
second affidavit, Scarfutti averred that at the time of the 2002
layoffs, there were three employees in the Department of Human
Resources under the age of forty, two of whom were slated for
termination. Due to special circumstances one of these two
employees was retained.  Twenty three employees in the Department
fell within the protected class. Only three of these employees,
Scully and two others, were terminated  The twenty remaining
employees, nine of whom were older than Scully, retained their

jobs.

>     **(n) ALC hired another Manager of Labor Relations
>     who was thirty years old and had five years of
>     experience**.

The record shows that this Manager was hired following ALC's acquisition of another specialty steel manufacturer and a consequent upturn in its economic outlook.  The hiring took place more than two years after Scully was terminated, and has no bearing on the issue of pretext. *See* Taylor v. Canteen Co., 69 F.3d 773, 782-83 (7th Cir. 1995) (finding that a job that became available several months after the employee's termination date "in no way indicate[d] that similar positions were open or available" at the time of the discharge").

## **4**. **The Overall Evidence of Pretext**

Based on the evidence of record, no reasonable factfinder could conclude that the business justification articulated by ALC in support of its decision to terminate Scully was false, <u>or</u> that the decision was instead more likely to have been based on age discrimination. Scully's inability to adduce evidence sufficient to establish <u>both</u> of these propositions is fatal to his ADEA claim. <u>Hicks</u>, 509 U.S. at 512 n.4. ALC is, therefore, entitled to summary judgment.

## **D**. **Claims Against the Individual Defendants Under the PHRA**

Because the court has determined that the record does not support a claim of age discrimination in violation of the ADEA,

Scarfutti and Murphy cannot be liable for aiding and abetting the discrimination  The individual defendants are entitled to summary judgment on the state law claims.

### E.  The ERISA Claim

Section 510 of ERISA, 29 U.S.C. § 1140 "makes it unlawful to interfere with the attainment of rights or benefits associated with an employee benefit plan." DiFederico v. Rolm Co., 201 F.3d 200, 203 (3d Cir. 2000). Scully claims that in terminating his employment, the ALC sought to prevent him from accruing full pension benefits which would have vested twenty-three months after his job was eliminated.

The standard applicable in Section 510 cases is "very clear." DeWitt v. Penn-Del Directory Corp., 106 F.3d 514, 522 (3d Cir. 1997). In order to recover, a plaintiff must demonstrate that the defendant had the specific intent to violate the statute. Id. In order to do this he must show that "the employee made a conscious decision" to interfere with his rights.  To establish a prima facie case, the plaintiff must show: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with any right to which the employee may become entitled." Gavalik v. Continental Can Co., 812 F.2d 834, 852 (3d Cir. 1988). General allegations of wrongful termination without other evidence will not suffice to sustain a claim under Section 510. See Romero v. SmithKline Beecham, 309 F.3d 113, 119

-22-

(3d Cir. 2002). Where, as here, the only evidence of specific intent is the "lost opportunity to accrue additional benefits, the employee has not put forth evidence to separate that intent from the myriad of other possible reasons for which an employer might have discharged him." Turner v. Schering-Plough Corp., 901 F.2d 335, 348 (3d Cir. 1990). Proof of loss of benefits incidental to a termination does not constitute a violation of section 510. Dewitt, 106 F.3d at 522.

When Scully's allegations are examined against the background of the record and the governing case law, it is clear that he has failed to state a claim for violation of ERISA, and that ALC is entitled to summary judgment with respect to this claim.[8]

### III.  CONCLUSION

It is never pleasant to force a competent, productive, loyal, long term employee from his job because of the economic

---

[8]If Scully had stated a claim, the ultimate result would not be different. The burden shifting analysis applied in evaluating an ADEA claim applies to ERISA claims as well. DiFederico, 201 F.3d at 203. In response to Scully's prima facie claim, the ALC would have asserted the same business justification advanced in the context of the ADEA. In order to avoid summary judgment, Scully would have had to point to evidence showing that the reason proffered for limiting his pension was pretextual.  There is no reason to believe that he would succeed in establishing pretext here where he was unable to do so in connection with his ADEA claim. Thus, ALC would have been entitled to Summary judgment on the ERISA claim even if Scully had succeeded in establishing a prima facie claim under the Act.

exigencies facing his employer. It is equally difficult for the court to find that the law cannot help him. Here, however, the relevant law and the facts constrain the court, and it is unable to offer relief to Scully.

> The job market, "like the jungle to which it is sometimes compared is pitiless. Nothing in the [ADEA] guarantees tenure to competent older workers who are terminated.[9] They can be let go for any reason or no reason, provided only that the reason is not their age.  They can be let go because they are not quite as good as someone else who can do their job, even if that someone is a young man."

Partington v. Broyhill Furn. Industries, Inc., 999 F.2d 269, 271 (7th Cir. 1993).

For the foregoing reasons, the Defendant ALC's Motion for Summary Judgment (Doc. 41) should be granted as to claims made pursuant to the ADEA and ERISA. The Motion for Summary Judgment filed by Defendants Scarfutti and Murphy (Doc. 43) should be granted with respect to claims made pursuant to the PHRA. The joint Defendants' Motion to Strike (Doc. 62 )should be denied as moot.

In accordance with the Magistrate's Act, 29 U.S.C. § 636 (b)(1) (B), 636 (b)(1)(b) and (c), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this Report and Recommendation are due by March 2, 2006.  Responses to objections

---

[9]ERISA ,too, can offer Scully little comfort. Nothing in that Act guarantees full benefits to every worker who is terminated - even those who are less than two years from vesting fully.

are due by March 13, 2006.


February 10, 2006


                                        S/ Francis X. Caiazza
                                        Francis X. Caiazza
                                        U.S. Magistrate Judge

cc:

Stephen M. Olson, Esq.
David J. Kolesar, Esq.
Kirkpatrick & Lockhart
Henry W. Oliver Bldg.
535 Smithfield Street
Pittsburgh, PA 15222


James B. Lieber, Esq.
Thomas M. Huber, Esq.
Lieber & Hammer, P.C.
5528 Walnut Street
Pittsburgh, PA 15232